# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 4, 2013

## VARIO TALLEY v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Shelby County
### No. 0408519     W. Mark Ward, Judge

### No. W2012-01478-CCA-R3-PC  - Filed July 30, 2013

Vario Talley[1] ("the Petitioner") filed a petition for post-conviction relief from his convictions for aggravated robbery and carjacking. In his petition, he alleged that he received ineffective assistance of counsel. After an evidentiary hearing, the post-conviction court denied relief, and this appeal followed. On appeal, the Petitioner asserts that his counsel at trial was ineffective in failing to object to the admissibility of video surveillance evidence. Upon our thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment
### of the Criminal Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Eric Mogy, Memphis, Tennessee, for the appellant, Vario Talley.

Robert E. Cooper, Jr., Attorney General & Reporter; Clarence E. Lutz, Assistant Attorney General; Amy Weirich, District Attorney General; and Jennifer Morris, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] We recognize that the Court, on direct appeal, spelled the Petitioner's last name "Tally." See State v. Vario Tally, No. W2008-01136-CCA-R3-CD, 2009 WL 4638226 (Tenn. Crim. App. July 14, 2009), perm. app. denied (May 12, 2010). However, all documents provided in the post-conviction proceedings have spelled the Petitioner's last name "Talley," including his signature on his petition for post-conviction relief. Therefore, we will utilize the spelling used in the post-conviction proceedings.

## OPINION

### Factual and Procedural Background

A jury convicted the Petitioner in March 2008 of aggravated robbery and carjacking. The trial court sentenced the Petitioner as a Range II offender to eighteen years on his aggravated robbery conviction and to twenty years on his carjacking conviction, to be served consecutively, for an effective sentence of thirty-eight years. On appeal, this Court affirmed the convictions and sentences. See Vario Tally, 2009 WL 4638226, at *9. To assist in the resolution of this proceeding, we repeat here the summary of the facts set forth in this Court's opinion resolving the Petitioner's direct appeal:

> The [Petitioner] and a co-defendant were convicted of aggravated robbery for their theft of cigarettes from a Mapco store and of carjacking a truck from the parking lot to make their escape.
>
> Sam Ajami testified that he was employed as a loss prevention specialist by Mapco Express and that, at the time of the incidents charged in the indictment, he was a Mapco district manager. He identified a DVD and a videotape bearing the date of August 16, 2004, both from surveillance equipment at the Mapco located at 6127 Stage Road in Bartlett.
>
> Eddie Scallions testified that he was an investigator with the Office of the Shelby County District Attorney General and identified a photograph which he had taken of a tattoo on the [Petitioner's] neck.
>
> Lisa Marie Allen testified that on August 16, 2004, she was employed as a fill station clerk at the Mapco Express on Stage Road in Bartlett. She said that a man wearing a sports jersey bearing the number 5 entered the store that day, purchased lottery tickets, went outside to scratch the tickets to see if they were winners, and came back inside to redeem the tickets. She said that the man wearing the jersey came in and out of the store "a couple" of times and that she paid attention to him for about fifteen minutes and was "[c]ounter space close" to him. He had a tattoo on the right side of his neck that said "Love Maria" or "Marina." She identified the [Petitioner] from a photospread and in the courtroom as the assailant with the tattoo.
>
> Allen said that there was a store room in the Mapco store, which contained cigarettes packed in cartons. There were "maybe a hundred cartons" which sold for $21.94 each at the time. As she was redeeming the lottery

tickets for the man wearing the jersey, she heard a noise from the store room, looked into the room, and saw "a black guy standing there with the white shirt on." She said that the man in the store room was putting cartons of cigarettes into pillowcases. She asked what he was doing and "then he pull[ed] a gun out at [her] and said . . . that if [she] did anything or said anything he would shoot to kill [her]." She said that she "started screaming[,] telling him to get out." He then "manhandled her," shoving her against an ice bin, and she "blacked out just for a moment." She said that she "grew up in the Marine Corps" and had been "around guns a lot." She described her assailant's pistol as black "like a Glock 9 [millimeter]." She said that, when he threatened her, she was "[p]retty well shook up and scared as hell." As the man left with the cigarettes, she ran after him, yelling, and went as far as the front door of the store. She got a hand on one of the pillowcases at the front door, and another customer tried to help her. The assailants "kept on saying, 'Shoot him. Shoot him,'" so they let go of the pillowcase. She said there were four pillowcases which would have held more than fifty cartons of cigarettes.

Chad Adams testified that he was employed as an electrician at Ellendale Electric Company. He said that August 16, 2004, was the first day he had attended International Electrical College, which was located behind the Mapco store in Bartlett. He was in a truck with Matt Mestemacher, with whom he was attending school. They went to the Mapco store to buy drinks for a break they had from classes. He said the parking lot was empty as they drove into it. Adams said that, as he entered the store, he heard "some rustling in the background and . . . a woman screaming Help, help." He said that "she was being drug by the bags." He "grabbed onto the bag [and] asked the fellow where he was going."

Adams said that two men were involved, one appeared to be the lookout and the other came from behind the cash register. He said that they got into a tug-of-war over the bags, but he let go after one of the men said, "Shoot him, shoot him." The men left with the bags, got into Mestemacher's truck, and drove "very quickly" west on Stage Road toward Covington Pike. Adams said that he did not have a gun and did not see either of the men with one. Mestemacher stayed outside to telephone his mother to inform her that his truck had been stolen.

Charles Matt Mestemacher testified that he was an electrician, employed by Ellendale Electric Company, and on August 16, 2004, was attending school at International Electrical College, located behind the Mapco

-3-

Express in Bartlett. He said that Chad Adams rode with him to the Mapco store, and he waited in his truck while Adams went inside. Three or four minutes later, an African-American man ran out of the Mapco store and told Mestemacher to get out of his truck or he would be shot. He said that the man who got into the driver's seat threw some bags into the back of the truck, and another man got in the passenger's seat. Mestemacher jumped out of his truck, and the two men drove away. He acknowledged that neither man pulled a gun on him.

Lieutenant Christopher Page of the Bartlett Police Department testified that he responded to an armed robbery call at the Mapco on Stage Road on August 16, 2004, at approximately 7:00 p.m. He spoke to Lisa Allen and viewed the surveillance video at the store. Lieutenant Page said that the [Petitioner] captured his attention the most on the videotape because of the clothing he was wearing, a "Nets jersey, red ball cap, number five." He said that the [Petitioner's] fingerprint was found on a pay phone outside the Mapco and that Ms. Allen identified the [Petitioner] from a photospread on August 20, 2004. Lieutenant Page said he collected into evidence nine cartons of cigarettes from the Mapco store room which were processed for latent prints.

Robert Davis, an AFIS[] specialist with the Shelby County Sheriff's Department and accepted by the trial court as an expert in the field of fingerprint identification, testified that his examination of the [Petitioner's] latent fingerprint and the fingerprint lifted from the pay phone at the Mapco revealed that they were a match.

The [Petitioner] elected not to testify and rested his case without presenting any proof.

Id. at *1-3. This summary does not reflect that the DVD introduced through Ajami was played for the jury. However, our review of the trial transcript, admitted as an exhibit at the hearing, reveals that the DVD was played during Allen's testimony and Adam's testimony. Both Allen and Adam testified about the contents of the DVD.

*Post-Conviction*

After conclusion of the direct appeal, the Petitioner timely filed a petition for post-conviction relief, alleging that he received ineffective assistance of counsel at trial ("Trial Counsel") and on appeal ("Appellate Counsel"). Although in the post-conviction court he claimed several instances of deficient performance by Trial Counsel and Appellate Counsel,

the Petitioner has raised only one issue on appeal: that Trial Counsel was deficient in failing to object to the admissibility of video surveillance evidence ("surveillance video") at trial on the basis that it was not properly authenticated and that the introduction of this evidence prejudiced the result of his trial. We will limit our recitation of the facts adduced at the post-conviction hearing accordingly.

Trial Counsel testified that he worked for the Shelby County Public Defender's Office but that he worked for the Harrison Law Firm when he represented the Petitioner at trial. Trial Counsel did not represent the Petitioner on his appeal.

Trial Counsel agreed that "one of the biggest things in this trial was the [surveillance video]." Trial Counsel recalled that Sam Ajami, the Mapco loss prevention specialist, was called at trial to "introduce" the surveillance video. He believed that Ajami worked for the district office that managed all of the Mapco stations in that region. Trial Counsel's "understanding was that [Ajami] was brought in to authenticate" the surveillance video. Trial Counsel recalled that Ajami testified to how the video surveillance footage at the Mapco stations was collected and "the procedure that [was] sort of triggered when there's an incident." He could not recall whether Ajami testified to how Mapco "ke[pt] these tape[s] and how long or anything like that."

Trial Counsel acknowledged that Ajami admitted at trial that he had not viewed the surveillance video until the morning of the trial, at which time he initialed it. He believed that Ajami also could not testify to who made the copy of the surveillance video. He also recalled that the "audio was the worse [sic] part" of it, and he agreed that the audio "was so bad [that] at one point . . . a jury member said . . . can we turn it up any more, something to that effect[.]" He could not state with certainty whether the surveillance video was in color, but he recalled that "you could certainly make out people and, you know, the counter."

Trial Counsel testified that he did not move to exclude the surveillance video at anytime. He agreed that it was used "extensively" and was "heavily relied on" by the State. He also believed that it was "a key component" in convicting the Petitioner.

On cross-examination, Trial Counsel agreed that Ajami testified that he "had knowledge of the store where the incident occurred" and that the video surveillance was taken from inside the store. He agreed that Allen, the Mapco clerk working the evening that the robbery and carjacking occurred, also watched the surveillance video during her testimony and identified "things," although Trial Counsel did not testify about what she was able to identify.

-5-

At the conclusion of the hearing, the post-conviction court took the matter under advisement. It subsequently issued a written order denying the Petitioner's claims for relief. The Petitioner timely appealed.

## Analysis

*Standard of Review*

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006); see also Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

*Ineffective Assistance of Counsel*

The Petitioner contends on appeal that he was denied effective assistance of counsel because Trial Counsel failed to object to the admissibility of the surveillance video filmed from inside the Mapco on the ground that it was not properly authenticated. He argues that the admission of this surveillance video prejudiced the result of his trial because it was "used to establish the Petitioner's identity" and "le[]d to [the Petitioner's] conviction[s]."

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[2] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls

_____

[2] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

"within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688). Our Supreme Court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation."

Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

Looking first to the prejudice prong, the Petitioner failed to make any showing of a reasonable probability that, had the surveillance video not been admitted into evidence at the trial, the result of the trial would have been different. Our review of the transcript of the trial reflects that both Adam and Allen first testified about the events that took place without reference to the surveillance video. Then, the surveillance video was played during their testimony, and they testified in conjunction with it. Accordingly, the video merely corroborated their trial testimony. Moreover, although Allen identified one of the men in the surveillance video as the Petitioner, she also testified before it was played that the Petitioner, whom she identified at trial, was one of the perpetrators. In making this in-court identification, she testified regarding a tattoo that one of the perpetrators had on his neck, and she confirmed at the trial that the Petitioner had that same tattoo on his neck. Furthermore, a photographic lineup was introduced at the trial on which she had circled a picture of the Petitioner as one of the perpetrators. For these reasons, the Petitioner failed to establish that the admission of the surveillance video "called into question the reliability of the outcome" of his trial. Pylant, 263 S.W.3d at 869 (citing Burns, 6 S.W.3d at 463). Because the Petitioner failed to establish that he was prejudiced by Trial Counsel's failure to object to the admissibility of the surveillance video, he is not entitled to post-conviction relief.

**CONCLUSION**

For the foregoing reasons, the Petitioner has failed to establish that he is entitled to post-conviction relief. Therefore, we affirm the judgment of the post-conviction court denying relief.

_____
JEFFREY S. BIVINS, JUDGE